**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

```
-------------------------------------------------------------X
                                                             *
JAMES ROSEMOND,                                              *
                                                             *
                         Petitioner,                         *
           v.                                                *
                                                             *  Case No. 5:21-cv-00175-JPB-JPM
RICHARD HUDGINS,                                             *
                                                             *
                  Warden, USP Hazelton,                      *
                  Respondent.                                *
-------------------------------------------------------------X
```

## CORRECTED PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

Michael Rayfield (*pro hac vice*)
Luc W. M. Mitchell (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10016
(212) 506-2560

*Counsel for Petitioner*
*(Additional counsel on signature page)*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

    A.      James Rosemond................................................................................. 3

    B.      The Drug Case .................................................................................. 3

    C.      The Murder-For-Hire Case ............................................................... 4

    D.      Rosemond's Efforts To Obtain Clemency ......................................... 6

    E.      President Trump's Commutation Of Rosemond's Sentence ................ 7

ARGUMENT ....................................................................................................... 8

I.      The President Completes An Irrevocable Act Of Clemency By Publicly
Communicating The Clemency Decision. ............................................................. 9

    A.      The Form Of An Act Of Clemency Does Not Matter So Long As The
President Communicates It Publicly. ....................................................... 9

    B.      The Wording Of An Act Of Clemency Does Not Matter So Long As The
President Reasonably Conveys The Clemency Decision. ................................. 13

    C.      An Act Of Clemency Is Irrevocable. ................................................... 15

II.     Rosemond Should Be Released From Prison Because President Trump
Commuted His Sentence To Time Served On December 18, 2020. .............................. 16

CONCLUSION.................................................................................................... 18

i

**INTRODUCTION**

James Rosemond is an inmate at USP Hazelton.  He has been in federal prison for over a decade as a result of convictions for murder for hire and several drug offenses.  On December 18, 2020, then-President Donald Trump commuted Rosemond's sentence to the time he had already served.  President Trump telephoned Jim Brown (the former NFL running back, actor, and criminal justice advocate) and his wife Monique Brown (the director of a leading social justice organization), two of the numerous people who have supported Rosemond's years-long efforts to obtain clemency.  According to the sworn declarations submitted by the Browns in support of this petition, President Trump said, in a room full of his staff, that he had "looked at everything" Rosemond submitted, that he "believe[d] you guys" (Rosemond and the Browns), and that Rosemond would be "*home for Christmas*."  Jim Brown Decl. (Ex. A) ¶ 6; Monique Brown Decl. (Ex. B) ¶ 5 (emphasis added).  The Browns took that statement to mean exactly what it said: that "Rosemond's sentence was commuted on December 18, 2020," and that he would be freed and sent home within a week.  Jim Brown Decl. ¶ 7; Monique Brown Decl. ¶ 6.

President Trump left office on January 20, 2021, the day President Joseph Biden was inaugurated.  During the intervening period, President Trump never suggested to the Browns—or to Rosemond himself—that he had decided *not* to commute Rosemond's sentence.  Jim Brown Decl. ¶ 8; Monique Brown Decl. ¶ 7.  But because President Trump did not send a *record* of the clemency to the Warden of USP Hazelton, Rosemond remains in prison.  Since President Trump left office, Rosemond has attempted to convince the Biden Administration to act on President Trump's commutation.  Because those efforts have been unsuccessful, Rosemond now seeks a writ of habeas corpus under 28 U.S.C. § 2241.  Rosemond's imprisonment is unconstitutional.

Although this exact situation is unprecedented—it does not appear to have happened in the history of the United States—the case law, historical records, and scholarship reveal three

1

important principles about the nature of the President's clemency power.  First, an act of clemency need not be conveyed in any particular *form* so long as the President communicates it publicly; it does not have to be in writing or announced to any specific person or entity.  *See, e.g.*, *Biddle v. Perovich*, 274 U.S. 480, 485-86 (1927).  Second, the particular *wording* of the clemency does not matter so long as the President reasonably conveys the clemency decision; no legal phrasing, such as "pardon" or "commutation," is necessary to accomplish an act of clemency.  *See, e.g.*, Allen Thorndike Rice, *Reminiscences of Abraham Lincoln by Distinguished Men of His Time* 344-45 (1886) (Ex. C) (explaining that President Lincoln pardoned a man by telling an acquaintance, "Job Smith is not to be shot until further orders from me").  Third, once the President completes an act of clemency, it cannot be *revoked*, either by the President granting clemency or by his or her successor.  *See, e.g.*, *In re De Puy*, 7 F. Cas. 506, 509 (S.D.N.Y 1869).

Taken together, these points yield an inescapable conclusion: Rosemond is serving a sentence that no longer exists, because President Trump commuted his sentence to time served on December 18, 2020.  President Trump made a public announcement of the clemency to the Browns (by phone) and to the people in the room with him at the time.  The words he used—including that Rosemond would be "home for Christmas"—reasonably communicated to the listeners that Rosemond would no longer be in prison by December 25 (Christmas Day, seven days later).  President Trump never suggested that he had decided against the act of clemency—nor *could* he, because the December 18 decision was irrevocable under the law.  And of course, neither President Biden nor the Warden of FCC Hazelton has the power to overturn that decision now.  Rosemond does not belong in prison for another day.  The Court should grant this petition.

## BACKGROUND

### A.    James Rosemond

Rosemond was born in 1965 in New York City.  Although he was raised in extreme poverty, he became a successful businessman and executive.  In 1996, Rosemond founded Henchmen Records, which would later become Czar Entertainment, a music management company based in Manhattan.  Rosemond represented many high-profile musicians, actors, and athletes, including Wyclef Jean, Brandy, Salt-N-Pepa, Michael K. Williams, and Mike Tyson. He has three children: a son and two daughters.

### B.    The Drug Case

The prosecution of Rosemond began with a hoax.  On November 30, 1994, the hip-hop artist Tupac Shakur was shot in a recording studio in New York; he was murdered in Las Vegas two years later.  In March 2008, the *Los Angeles Times* published a story alleging that Rosemond was responsible for arranging the 1994 assault on Shakur.  Three weeks later, after the story had been widely distributed and repeated, the *Times* retracted it, apologized to Rosemond, and fired the author, explaining that the story was built on fabricated FBI reports.  *See Times Retracts Shakur Story*, L.A. Times (Apr. 7, 2008) (available online).  But rumors continued to circulate about a link between Rosemond and the Shakur shootings.

Shortly after the debunked article was published, the Eastern District of New York began investigating Rosemond for drug charges.  The government had no physical evidence connecting Rosemond to any drugs, guns, or paraphernalia.  But in 2011, it charged Rosemond with violating the federal "Drug Kingpin" statute based on the testimony of five informants who *were* found with contraband and were facing long sentences, one of whom later admitted that *he* was the "king pin but they wanted Jimmy [Rosemond]."  These witnesses each served less than four

years in prison, and have been home since 2014 or earlier. Rosemond was found guilty and received multiple life sentences. *See United States v. Rosemond*, No. 11-cr-424 (E.D.N.Y.).

Rosemond appealed to the Second Circuit. *See United States v. Rosemond*, 595 F. App'x 26 (2d Cir. 2014). Among other things, he argued that his trial was unconstitutional because two jurors had conducted online research about the Shakur shooting and admitted that this research affected their deliberations. Rosemond relied on a sworn statement from a journalist who had interviewed one of the jurors on Rosemond's panel; the affidavit explained that two of the other jurors believed "Rosemond was guilty due to his involvement in the Tupac thing." *Id.* at 30. But the Second Circuit rejected Rosemond's appeal, finding the affidavit insufficient because it did not "mention any extrajudicial research." *Id.* at 29-30.

Rosemond then filed a petition under 28 U.S.C. § 2255 with the district court, raising the same issue with a new affidavit in support. *See Rosemond v. United States*, 378 F. Supp. 3d 169 (E.D.N.Y 2019). This affidavit explained that two of the jurors "admitted they had researched Mr. Rosemond's connection with Tupac Shakur on the internet," and "broadly and generally conducted research on James Rosemond on the internet." *Id.* at 176. Without holding an evidentiary hearing, the district court denied Rosemond's petition on the ground that "it is virtually impossible" "in the internet age" "to keep the jury's consideration of material facts entirely to the record." *Id.* at 187. Rosemond asked the Second Circuit to issue a certificate of appealability; this request was denied in June 2020.

### C.    The Murder-For-Hire Case

The murder-for-hire case likewise arose from a feud that Rosemond had no role in starting. Rosemond used to represent Jayceon Taylor, a prominent hip-hop artist known as "The Game." The Game was originally a member of G-Unit, a group led by Curtis Jackson, best known as "50 Cent." In 2005, 50 Cent fired The Game from G-Unit, sparking a violent feud

between G-Unit's associates and The Game's.  In 2007, a group of G-Unit associates surrounded Rosemond's 14-year-old son on the street, drew guns, and assaulted him.  One of the assailants was Lowell Fletcher, a former lieutenant for the Bloods gang.  Fletcher went to prison for the assault and, shortly after his release in September 2009, he was shot and killed in the Bronx.

Rosemond was indicted in the Southern District of New York for murder for hire.  *See United States v. Rosemond*, No. 10-cr-00431 (S.D.N.Y.)  The government did not contend that Rosemond was present at the scene of the murder or that he orchestrated the plan to carry it out. Instead, the government's theory was that Rosemond gave Brian McCleod, another aspiring musician, $30,000 worth of cocaine to plan and carry out the shooting.  McCleod—the government's star witness—denied this allegation.  He told the government from the beginning—both in private meetings and at trial—that Rosemond "never told me to murder Lowell Fletcher" and "never mentioned killing Fletcher at all."  *See United States v. Rosemond*, 841 F.3d 95, 104-05 (2d Cir. 2016).

Rosemond's case was tried three times.  The first time, the jury deadlocked.  The second time, Rosemond was convicted.  But the Second Circuit held that the conviction violated the Sixth Amendment because the district court had prevented the defense from asking McCleod whether Rosemond ordered the shooting or even arguing that he lacked an intent to kill.  *Id.* at 112 (holding that the district court's "restrictions on Rosemond's ability to cross-examine his witnesses and mount an effective defense violated the Sixth Amendment").

So Rosemond was tried for a third time—and this time, he was deprived of his rights by his own lawyer.  Rosemond repeatedly told his attorney, both before and during trial, that he had hired associates only to bring Fletcher to him, and that he never intended for Fletcher to be shot, let alone killed (an account consistent with McCleod's).  But the jury never actually heard

Rosemond's account of the facts because, over his vehement objection, his attorney decided to tell the jury an entirely different story with no evidentiary support: that Rosemond had hired people to shoot Fletcher, but that his intent was a *non-fatal* shooting.  Counsel told the jury during closing arguments that Rosemond "paid for a shooting," and that he "set up the shooting," but that "unfortunately for everyone involved," "one of the bullets" simply "hit the target in the wrong spot."  The jury convicted, the Second Circuit affirmed—rejecting Rosemond's argument that he received ineffective assistance of counsel—and the Supreme Court denied certiorari.  *See United States v. Rosemond*, 958 F.3d 111 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1057 (2021).

Between the drug and murder-for-hire convictions, Rosemond was sentenced to a total of nine consecutive life sentences.  He has been in federal custody since 2011, and is currently a prisoner at USP Hazelton in Bruceton Mills, West Virginia.

### D.      Rosemond's Efforts To Obtain Clemency

In January 2015, Rosemond began to seek clemency from the Obama Administration, and he continued those efforts after President Trump was elected.  His clemency petition received overwhelming support from diverse sectors of society.  Among his supporters were:

- Athletes, including Jim Brown (the Hall of Fame running back) and Mike Tyson (the former Heavyweight Champion);

- Politicians, including James McGreevy (the former governor of New Jersey), Dan Quart (a New York State Assemblyman), Inez Dickens (a New York State Assemblywoman), and Eric Perrodin (the former Mayor of Compton);

- Actors, including Michael K. Williams and Queen Latifah;

- Musicians, including Wyclef Jean and Akon;

- Current and former prosecutors, including Brett Tolman (the former U.S. Attorney for the District of Utah) and J. Bruce Maffeo (a former Assistant U.S. Attorney for the Eastern District of New York);

- Investigative journalists, including Donald J. Sikorski (who produced a documentary film series on Rosemond's case);

- Numerous police officers, firefighters, and correctional officers; and

- A former judge, Justice Betty Williams (Supreme Court of New York).[1]

Starting in October 2018, Rosemond's clemency petition began to get serious attention from the Trump Administration. That month, Jim and Monique Brown were invited to the White House to discuss Rosemond's case (among other topics) with President Trump and his advisors. The President asked Rosemond's team to send him more information related to the clemency petition. Over the next two years, the Browns and Rosemond's other supporters participated in multiple calls with President Trump's advisors, and visited the White House three more times to discuss Rosemond's case. These efforts culminated in a December 2020 meeting at the White House, at which President Trump's advisors presented their findings and recommendations.

### E.     President Trump's Commutation Of Rosemond's Sentence

On December 18, 2020, President Trump telephoned Jim and Monique Brown, who had served as the main liaisons between the White House and Rosemond's clemency team. As described in the sworn affidavits they provided in support of this petition (Exhibits A and B), the conversation took place as follows:

> On December 18, 2020, President Trump called me and informed me that **he had decided to commute Mr. Rosemond's sentence to the time he had already served in prison.**
>
> During this conversation, President Trump told people in the room with him: "Let's get this guy **home for Christmas**." He told me that he had "looked at everything"—meaning the materials we had provided about Mr. Rosemond's case—and "believe you guys" that Mr. Rosemond's sentence should be commuted. "I want to do this," President Trump added, referring to the commutation.

---

[1]     A sampling of letters written in support of Rosemond's clemency petition—from Betty Williams, Jim Brown, Michael K. Williams, and Don Sikorski—is attached as Exhibit D to this petition. Sikorski's documentary series about Rosemond—titled "Unjust Justice"—is available on YouTube.

> Based on my conversation with President Trump, I believe that Mr.
> Rosemond's sentence was commuted on December 18, 2020.

Jim Brown Decl. ¶¶ 5-7; Monique Brown Decl. ¶¶ 4-6 (emphases added in both).[2]

President Trump, however, never sent a record of the commutation to the Warden of USP

Hazelton.  On January 20, 2021, President Trump left the White House.  "During the intervening

period, President Trump never suggested to [Jim or Monique Brown] that he had decided not to

commute Mr. Rosemond's sentence."  Jim Brown Decl. ¶ 8; Monique Brown Decl. ¶ 5.

Since President Trump departed office, Rosemond has attempted to persuade the Biden

Administration to act on his commutation.  Those efforts have been unsuccessful.

## ARGUMENT

A district court may grant a writ of habeas corpus to a prisoner in the court's jurisdiction

who is "in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C § 2241(c)(3).  Rosemond is in custody within this District in violation of Article II,

Section 2 of the Constitution, which empowers the President to commute the sentences of federal

prisoners.  The President completes an irrevocable act of clemency by publicly communicating

the clemency decision.  Because President Trump commuted Rosemond's sentence to time

served on December 18, 2020, announcing publicly that Rosemond would be "home for

Christmas," Rosemond's imprisonment is unconstitutional.  His petition should be granted.

---

[2]     The statements in these affidavits are not hearsay because they are not being offered for
the truth of the matters asserted—for example, that Rosemond would be "home for Christmas"
(he was not in fact home for Christmas).  The statements are offered for their *legal effect*—for
the fact that the statements were *made*, in public, and communicated that Rosemond's sentence
had been commuted.  If the Court would like the recording of the telephone conversation,
Rosemond is prepared to file a subpoena seeking the recording from the White House.

I. **The President Completes An Irrevocable Act Of Clemency By Publicly Communicating The Clemency Decision.**

The Constitution provides that "[t]he President . . . shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of impeachment."  U.S. CONST. art. II § 2.  There are two common forms of clemency covered by this clause:  one is a full pardon, which effectively eliminates a conviction; the other is a commutation, which alleviates someone's punishment without altering the conviction itself.  *See generally Schick v. Reed*, 419 U.S. 256, 260-66 (1974).  The Supreme Court has long held that the President's clemency powers are "broad" and "unfettered" except in cases of impeachment:  "The plain purpose of the broad power conferred by [the clemency clause] was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions."  *Id.* at 262, 266; *see also Stover v. Meese*, 625 F. Supp. 1414, 1417 (S.D. W. Va. 1986) (power to grant clemency "is subject to the unfettered discretion of the president—a discretion as broad as any known to the law").

There does not appear to be a judicial decision addressing the precise circumstance here: where a President orally commutes a sentence and leaves office without creating any written record memorializing the commutation.  But the authorities and historical materials establish three propositions relevant to Rosemond's case: (a) an act of clemency need not take any specific form so long as the President communicates it publicly; (b) an act of clemency need not be phrased in any specific way so long as the President reasonably conveys the clemency decision; and (c) once an act of clemency is completed, it cannot be reversed.

A. **The Form Of An Act Of Clemency Does Not Matter So Long As The President Communicates It Publicly.**

A President grants clemency simply by taking a public act that communicates the decision.  The decision need not be (i) in *writing* or (ii) *delivered* to any particular person.

9

The first of these principles has never been in serious dispute. In 1929, the Solicitor General was asked to opine on whether an act of clemency must take any particular form, such as a written document, and answered in the negative. *See* Alfred A. Wheat, *Memorandum for the Attorney General* (Mar. 27, 1929) (Ex. E) ("SG Memo"). The Solicitor General explained that because "[n]either the Constitution nor any statute prescribes the method by which Executive clemency shall be exercised or evidenced," that method "is wholly a matter for the President to decide, as a practical question of administrative policy." *Id.* at 2.

Importantly, the Solicitor General distinguished the *exercise* of clemency from the *record* of clemency: "Nobody but the President can exercise the [clemency] power, but *the power having been exercised* the method of making a *record and evidence thereof is a mere detail* which he can prescribe in accordance with what he deems to be the practical necessities and proprieties of the situation." *Id.* (emphases added). The purpose of the *record* is to give "the pardoned man . . . some token to show that he has been pardoned," but that record, like a diploma hung from the wall, is distinct from the clemency act itself. *Id.* The Solicitor General had "no doubt whatever that pardon warrants . . . may be issued without autograph signature of the President." *Id.* at 6; *see also* Jeffrey Crouch, *The Toussie Pardon, "Unpardon," and the Abdication of Responsibility in Clemency Cases* 90 (2011) (Ex. F) ("The pardon attorney may have been responsible for delivering a *record* of the pardon to individual recipients . . . , but the record of the pardon was just that—it was not the actual pardon, but merely a memento of the master clemency warrant.").

By contrast, there was some early debate about whether an act of clemency must be communicated to a *specific* person—that is, whether the clemency power is subject to a "delivery" requirement. In *In re De Puy*, 7 F. Cas. 506 (S.D.N.Y 1869), a district court held that

because "a pardon must be regarded as a deed," "delivery is essential" to its "validity." *Id.* at 511. The court relied on dicta from a Supreme Court decision noting that "[a] pardon is an act of grace"; "[i]t is the private, though official, act of the executive magistrate, delivered to the individual for whose benefit it is intended." *Id.* (quoting *United States v. Wilson*, 32 U.S. 150, 160-61 (1833)). The district court held that the petitioner's pardon was invalid because, although it had been signed by President Johnson, it had been sent only to the marshal of the Southern District of New York, not to the warden of the prison. *Id.* The court found this insufficient because the marshal had "no power to take a prisoner out of prison"; "delivery of a pardon, in order to be effective, must be, at least, a delivery to the keeper of the prison." *Id.* at 512.

Although no court has expressly rejected the *De Puy* rule, it is widely understood to be irreconcilable with the Supreme Court's 1927 decision in *Biddle v. Perovich*, 274 U.S. 480 (1927); *see, e.g.*, Crouch, *supra*, at 89. In *Biddle*, the petitioner was convicted of murder and sentenced to death. 274 U.S. at 485. "President Taft executed a document by which he purported to 'commute the sentence of [the petitioner] . . . to imprisonment for life in a penitentiary to be designated by the Attorney General of the United States.'" *Id.* (ellipsis in original). The petitioner was then removed from jail and placed in a federal penitentiary. *Id.* But because he was unsatisfied with the commutation—he wanted a full pardon—he applied "for a writ of habeas corpus on the ground that his removal from jail to a penitentiary and the order of the President were without his consent and without legal authority." *Id.*

The Supreme Court disagreed, rejecting the principle adopted in *Wilson* and *De Puy*:

> ***A pardon in our days is not a private act of grace*** from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that ***the public welfare will be better served by inflicting less than what the judgment fixed***. Just as the original punishment would be imposed without regard to the prisoner's

> consent and in the teeth of his will, whether he liked it or not, the
> public welfare, not his consent determines what shall be done.

*Id.* at 486 (emphases added) (citation omitted).  Notably, there was no indication in *Biddle* that a record of the President's commutation was delivered to anyone; the petitioner was transferred immediately when the Attorney General designated a federal penitentiary.  *See id.* at 485.

The modern view is that *Biddle*'s holding, and its rejection of the *Wilson* dicta, are inconsistent with any delivery requirement.  In 2011, for example, "the Bush administration investigated whether the new chief executive had the power to stop the delivery of some of outgoing president Bill Clinton's controversial 'last minute' pardons that had not yet made their way to the intended recipients."  Crouch, *supra*, at 89.  Margaret Colgate Love—who served as the United States Pardon Attorney in the Justice Department from 1990 to 1997—was asked to testify about this subject at a hearing conducted by the House Judiciary Subcommittee.  *See id.*  Love was asked about the continued relevance of *De Puy* and the potential for the Bush Administration to rescind President Clinton's pardons, and she responded that these pardons were complete even if the individual records had not yet been delivered.  Love explained that the concepts of "deeds and delivery" had been "overcome[] after the *Biddle* case," and that under modern law, the only requirement for clemency is a "public act."  *Id.* (quoting Testimony of Margaret Colgate Love, House Judiciary Subcommittee on the Constitution 93 (Feb. 28, 2001)).  Love added that in her "own experience" as Pardon Attorney, her office "didn't deliver individual pardon warrants to the recipients sometimes for weeks," and that those records were "nothing more than a symbol, a sign of what the president did."  *Id.*

The delivery requirement has also ceased to exist as a matter of practice.  "Presidents Ford and Carter granted clemency to hundreds of thousands after the Vietnam War, yet the only official notification that may have gone out to many intended recipients was a phone call or even

merely a press release.  Nevertheless, those individuals have been treated by the rest of the world as having been pardoned for three decades."  *Id.* at 91.  And when President Bush attempted to revoke a pardon issued to Isaac Robert Toussie in 2008, the prevailing belief was that President Bush lacked the authority to do so even though the pardon had never been delivered:  once "the Department of Justice announced the pardons to the public, and Toussie's lawyer was called with news of the pardon . . . , the Toussie pardon became effective and irrevocable."  *Id.* at 85 (citing scholarship) (quotation marks omitted).[3]

In short, as Margaret Love has explained, "[t]he president can [issue an act of clemency] pretty much in any form he wants, as long as it's a public announcement."  Ryan J. Reilly, *It'd Be Pretty Easy for Trump to Pardon His Family Members.  He Could Even Tweet It*, HUFFPOST (July 31, 2017) (Ex. G) (quoting Love).  The President can grant clemency through a writing, a phone call, a television broadcast, a social media post, or by "stick[ing his] head out the window" and "yell[ing] it out on the street."  *Id.* (same).

### B.   The Wording Of An Act Of Clemency Does Not Matter So Long As The President Reasonably Conveys The Clemency Decision.

The clemency power has never been understood to depend on the President's use of any particular word or phrase.  Presidents have routinely executed acts of clemency using layperson's language and even colloquialisms.  As long as the President reasonably conveys the content of the decision, it is always given effect.

Some of the best examples come from the records of President Lincoln's pardons during the Civil War.  President Lincoln often granted clemency to imprisoned Union and Confederate soldiers facing the death penalty for crimes like desertion and theft.  According to historians,

---

[3]   The legal effect of President Bush's attempted revocation was never addressed in the courts; Toussie was not in prison, and did not challenge the President's decision.

both the substance and form of these acts of clemency were "idiosyncratic"; "no pattern [could] be discerned" from President Lincoln's approach.   William C. Davis, *Lincoln's Men: How President Lincoln Became Father to an Army and a Nation* 175-76 (1999) (Ex. H).

On one occasion, for instance, President Lincoln spoke with a prisoner and simply "scribbled" on a piece of paper:  "Let him fight instead of being shot."  *Id.*  On another occasion, he told the mother of a wounded soldier, in person:  "You shall have your boy, my dear madam. To take him from the ranks of rebellion and give him to a loyal mother is a better investment for this government than to give him up to its deadly enemies."  Rice, *supra*, at 508.

Notably, even when President Lincoln used *forward-looking*, *qualified* language, his acts of clemency were given immediate effect.  One historian recounted the following conversation between President Lincoln and the father of a soldier sentenced to death:

> On being introduced into Mr. Lincoln's presence, [the father] was accosted with, "Well, my old friend, what can I do for you to-day?"  The old man then repeated to Mr. Lincoln what he had already told the Congressman in the anteroom [about his son's death sentence].  A cloud of sorrow came over the President's face as he replied, "I am sorry to say I can do nothing for you.  Listen to this telegram received from General Butler [the commander of the soldier's army] yesterday:  'President Lincoln, I pray you not to interfere with the courts-martial of the army.  You will destroy all discipline among our soldiers.'—B. F. Butler."
>
> Every word of this dispatch seemed like the death knell of despair to the old man's newly awakened hopes.  Mr. Lincoln watched his grief for a minute, and then exclaimed, "By jingo, Butler or no Butler, here goes!"—writing a few words and handing them to the old man.  The confidence created by Mr. Lincoln's words broke down when he read—"***Job Smith is not to be shot until further orders from me***—Abraham Lincoln."
>
> "Why," said the old man, "I thought it was to be a pardon; but you say, 'not to be shot till further orders,' and you may order him to be shot next week."  Mr. Lincoln smiled at the old man's fears, and replied, "Well, my old friend, I see you are not very well acquainted with me.  If your son never looks on death till further

14

> orders come from me to shoot him, he will live to be a great deal older than Methuselah."

*Id.* at 344-45 (emphasis added).

Another historian describes a conversation among President Lincoln, two Indiana senators, and a woman named Mrs. Bullitt whose father (a preacher) had been sentenced to death for conspiring with the enemy.  According to the records:

> Lincoln, as one of the senators presented the case, had a sad, preoccupied, faraway look.  Then Mrs. Bullitt, sitting near him, spoke.  He looked at the pale little woman, his face lighting up with a kindly expression, and he paid close attention to her every word.  Suddenly he asked her father's name, and she told him.

> "Why, he preached in Springfield years ago, didn't he?"  Yes, he had.  "Well, this is wonderful!"  Lincoln said.  "I knew this man well; I have heard him preach; he was a tall, angular man like I am, and I have been mistaken for him on the streets.  Did you say he was to be shot day after tomorrow?  No, No!  ***There will be no shooting nor hanging in this case***."

Richard N. Current, *The Lincoln Nobody Knows* 167 (1958) (Ex. I) (emphasis added).

Therefore, even when the President uses language describing a future state of affairs— "Job Smith is not to be shot until further orders from me," or "[t]here will be no shooting nor hanging in this case"—an act of clemency has been treated as complete from the moment the President conveys the substance of the decision.  That makes sense because, as explained above (at pp. 9-13), the act of clemency is distinct from the (largely symbolic) record of clemency.

### C.    An Act Of Clemency Is Irrevocable.

There has never been any dispute among the courts that an act of clemency, once completed, cannot be revoked by either the same President or a later one.  This issue was first addressed in *De Puy*.  There, President Grant attempted to reverse a pardon issued by President Johnson.  *See* 7 F. Cas. at 513.  As discussed above (at pp. 10-11), the district court denied the petitioner relief based on the now-defunct rule that a pardon is not complete until it is

"delivered." *Id.* But the court first made clear that a *completed* pardon is irrevocable: "***The law undoubtedly is, that when a pardon is complete, there is no power to revoke it***." *Id.* at 509 (emphasis added); *see also id.* at 513 ("It has not been contended, on the part of the United States, that the president has power to annul, or withdraw, or cancel a completed pardon.").[4]

In sum, the President completes an irrevocable act of clemency by publicly communicating the clemency decision. The specific form and wording do not matter. Nor does clemency depend on whether (or when) the record of the pardon is transmitted.

## II.   Rosemond Should Be Released From Prison Because President Trump Commuted His Sentence To Time Served On December 18, 2020.

Under the principles described above, President Trump commuted Rosemond's sentence to time served on December 18, 2020. Rosemond is therefore being held in custody based on a sentence that has run its course, "in violation of the Constitution." 28 U.S.C § 2241(c)(3).

First, President Trump completed a public act of clemency by announcing his decision to Jim Brown, Monique Brown, and other "people in the room." Jim Brown Decl. ¶¶ 5-6; Monique Brown Decl. ¶¶ 4-5. The common law has long treated a communication as "public[]" simply if it is sent from "one person to another." *United States v. Chase*, 135 U.S. 260-61 (1890) (defamation law). Presidents have granted clemency by phone (Crouch, *supra*, at 91) and in person (Rice, *supra*, at 508). Here, President Trump did both: He communicated the clemency decision via a recorded phone call to two people, with several others in the room listening. If a President can issue a commutation by "stick[ing his head] out the window" and "yell[ing] it out on the street" (Reilly, *supra* (quoting Love)), he can certainly do so in this manner.

---

[4]   The President has the authority to place *conditions* on an act of clemency. *See Schick*, 419 U.S. at 257. But the clemency decision itself is irrevocable. And in any event, President Trump did not purport to place any conditions on Rosemond's commutation.

Second, President Trump's wording plainly conveyed the clemency decision.  He said (a) that he had "looked at everything" (referring to Rosemond's clemency materials); (b) that he "believe[d] you guys" (Rosemond and the Browns); (c) that he "want[ed] to do this" (the commutation); and (d) that Rosemond would be "home for Christmas"—the following week. Jim Brown Decl. ¶ 6; Monique Brown Decl. ¶ 5.  Notably, this language is *more* immediate and descriptive than the language used in several of President Lincoln's pardons.  *Cf.* Davis, *supra*, at 176 ("Let him fight instead of being shot."); Rice, *supra*, at 344-45 ("Job Smith is not to be shot until further orders from me.").  But in any event, President Trump's message could only be interpreted one way, and the Browns *did* interpret it this way: "Rosemond's sentence was commuted on December 18, 2020."  Jim Brown Decl. ¶ 7; Monique Brown Decl. ¶ 6.

Finally, as discussed above (at pp. 15-16), President Trump's clemency decision was irrevocable once it was communicated on December 18, 2020.  *See, e.g.*, *De Puy*, 7 F. Cas. at 513.  But what makes this case unusual—even when compared to the *De Puy* and Toussie matters—is that no President has even *tried* to revoke Rosemond's commutation.  From December 18, 2020 until he left the White House on January 20, 2021, President Trump "never suggested" to either of the Browns—much less to Rosemond—"that he had decided not to commute Mr. Rosemond's sentence."  Jim Brown Decl. ¶ 8; Monique Brown Decl. ¶ 5.  And although Rosemond has been unsuccessful in obtaining relief from the Biden Administration, President Biden has never suggested that he disagrees with President Trump's decision—a belief that would be irrelevant anyway.

President Trump's clemency decision was a "determination of the ultimate authority that the public welfare will be better served by inflicting less [on Rosemond] than what the judgment fixed."  *Biddle*, 274 U.S. at 486.  Yet Rosemond continues to sit in prison simply because the

President never delivered a record of the clemency to USP Hazelton—an act that should have been "nothing more than a symbol."  Crouch, *supra*, at 89 (quoting Love); *see* SG Memo at 2, 6. This kind of case is why habeas corpus exists.  Rosemond's petition should be granted.

## CONCLUSION

The Court should grant Rosemond's petition for writ of habeas corpus and direct the Warden of USP Hazelton to release Rosemond from prison immediately.

Respectfully submitted,

/s/ *Michael Rayfield*
Michael Rayfield (*pro hac vice*)
Luc W. M. Mitchell (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10016
(212) 506-2560

/s/ *Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WV Bar No. 3894)
Michelle K. Schaller (WV Bar No. 13255)
FLAHERTY SENSABAUGH BONASSO, PLLC
48 Donley Street, Suite 501
Morgantown, WV 26501
(304) 598-0788

*Counsel for Petitioner*

Date: December 9, 2021

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JAMES ROSEMOND,**

        **Petitioner,**

**v.**                                   **Civil Action No.: 5:21-cv-175-JPB-JPM**

**RICHARD HUDGINS,**

        **Warden, USP Hazelton,
Respondent.**

**CERTIFICATE OF SERVICE**

I, Jeffrey M. Wakefield, counsel for Petitioner, James Rosemond, do hereby certify that on the 9th of December, 2021, the foregoing **"CORRECTED PETITIOIN FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241"** was served upon the following via U.S. Postal Service to:

Richard Hudgins
Warden USP Hazelton
1640 Sky View Dr
Bruceton Mills, West Virginia  26525

/s/ Jeffrey M. Wakefield
  Jeffrey M. Wakefield (W. Va. Bar # 3894)