**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**JAMES ROSEMOND,**

        Petitioner,

v.                                         **Civil Action No. 5:21-CV-175**
                                                    Judge Bailey

**RICHARD HUDGINS,** Warden,
USP Hazelton,

        Respondent.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On October 7, 2021, James Rosemond filed a Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 [Doc. 1] (the "petition")[1]. The petitioner is a federal inmate housed at USP Hazelton in Bruceton Mills, West Virginia, and is challenging his imprisonment as unconstitutional. The petition does not attempt to challenge the legality of petitioner's conviction or sentence as originally-imposed; rather, he argues that his sentence was commuted by President Trump to time served. On January 19, 2022, this Court ordered respondent to show cause why the petition should not be granted. On April 4, 2022, respondent filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. [Doc. 23]. On June 23, 2022, petitioner filed a response in opposition to the Motion [Doc. 32]. On July 22, 2022, respondent filed a reply. The Motion is now fully

---

[1] The Court notes that on December 9, 2021, petitioner filed an amended petition [Doc. 13], and on December 14, 2021, this Court granted leave to amend. The amended petition changed only the named warden to reflect that the originally-named warden had been transferred to another facility. The substance of the petition was unchanged.

briefed and ripe for decision. The matter is currently pending before the undersigned for a Report and Recommendation pursuant to LR PL P 2. For the reasons set forth below, the undersigned recommends that the Motion to Dismiss be granted and that the petition be dismissed.

## II. **BACKGROUND**

On April 5, 2012, a Superseding Indictment was filed in the United States District Court for the Eastern District of New York, charging petitioner with continuing criminal enterprise; conspiracy to distribute cocaine; two counts of attempted possession with intent to distribute cocaine; three counts of distribution of cocaine; firearms possession in connection with drug trafficking; felon in possession of a firearm; money laundering conspiracy; unlawful transactions over $10,000; structuring financial transactions; and obstruction of justice.[2] Following trial, on June 5, 2012, the jury found Rosemond guilty on all thirteen counts. On October 25, 2013, Rosemond was sentenced to life imprisonment. Following an appeal, the sentencing court entered an Amended Judgment on January 20, 2015, dismissing count two; the sentence remained a total term of life imprisonment.

On December 9, 2013, a superseding indictment was filed in another federal case, in the United States District Court for the Southern District of New York, charging petitioner with murder for hire conspiracy; murder for hire; firearms in possession during

---

[2] The facts of this case are taken from petitioner's criminal case, **USA v. Rosemond et al**, 1:11-CR-00424-ENV-4 in the United States District Court for the Eastern District of New York, available on PACER. **Philips v. Pitt Cnty. Mem. Hosp.**, 572 F.3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of public record); **Colonial Penn. Ins. Co. v. Coil**, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the contents of court records.'").

murder for hire conspiracy; and murder through use of a firearm.[3]  The first trial ended in a mistrial on March 7, 2014.  Petitioner was retried, and a jury convicted Rosemond on all counts on December 11, 2014.  On appeal, the Second Circuit vacated the conviction.  Rosemond was tried a third time, and on November 28, 2017, petitioner was again found guilty on all counts.  On November 8, 2018, petitioner was sentenced to life imprisonment plus thirty years, with the sentence to run consecutively to the term of imprisonment imposed in the Eastern District of New York.

### III.   CLAIMS OF THE PETITION

In his petition, Rosemond claims that then-President Donald Trump commuted Rosemond's sentence to time served on December 18, 2020.  According to the petition, President Trump called Jim and Monique Brown.  Jim Brown is a former NFL running back, actor, and criminal justice advocate.  Monique Brown, Jim's wife, is a director of social justice organization.  Both had supported Rosemond's efforts to obtain clemency and had submitted materials to President Trump regarding these efforts.  According to the Browns' sworn affidavits, they received a phone call from President Trump on December 18, 2020:

> 5.     On December 18, 2020, President Trump called me and informed me that he had decided to commute Mr. Rosemond's sentence to the time he had already served in prison.
>
> 6.     During this conversation, President Trump told people in the room with him: "Let's get this guy home for Christmas."  He told me that he had "looked at everything"– meaning the materials we had provided about Mr. Rosemond's case–and "believe you guys" that Mr. Rosemond's sentence should be commuted.  "I want to do this," President Trump added, referring to the commutation.

---

[3] The facts of this case are taken from *USA v. English et al*, 1:10-CR-00431-LAK-7 in the United States District Court for the Southern District of New York, available on PACER.

3

[Doc. 1-1 ¶ 5–6]. The Browns understood this conversation to mean that President Trump was commuting Rosemond's sentence to time served, effective December 18, 2020. Despite this conversation, no record of clemency was sent to the warden of USP Hazelton, and Rosemond remains incarcerated. President Trump left office on January 20, 2021, and no written record of commutation was created.

Petitioner argues that on the December 18, 2020 phone call, President Trump commuted his sentence to time served, and that he is therefore being held after the completion of his sentence and in violation of the Constitution. He argues that the form of an act of clemency does not matter so long as it is public and that the phone call sufficed; that the wording of the phone call reasonably conveyed the clemency decision; and that the act of clemency is irrevocable.

## IV.    THE INSTANT MOTION

On April 4, 2022, respondent filed his Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. [Doc. 23]. In the memorandum in support, respondent argues, first, that under the criteria petitioner sets forth in his petition, he is not entitled to relief. Respondent argues that the December 18, 2020 phone call, made between President Trump and the Browns, with President Trump's staff members in the room, was not "publicly communicated." [Id.]. Further, respondent argues that the statements the president made on the December 18, 2020 phone call were ambiguous and "do not clearly or reasonably qualify as a grant of clemency in the form of a sentence commutation." [Doc. 24 at 10].

Second, respondent argues that petitioner is not entitled to relief because a presidential clemency warrant was never issued. Respondent outlines the standard

process for applying for clemency set forth in 28 C.F.R. §§ 1.1 through 1.11 by which petitions are submitted to the Pardon Attorney who then makes a recommendation to the President.  When a commutation of sentence is granted, the petitioner is normally notified and a warrant of commutation is sent to the petitioner.  Respondent argues that petitioner is not entitled to relief because no warrant of commutation was issued in this case.  Respondent further points out that during his presidency, President Trump granted 238 acts of clemency, including 94 sentence commutations, each of which included a warrant of commutation.  Respondent argues that the lack of any warrant of commutation in this case "do[es] not evince an intent to commute petitioner's sentence."  [Doc. 24 at 14].  Further, respondent argues that the records of the Pardon Attorney should be granted deference, and that executed warrants exist to make clear the President's intent regarding clemency decisions.

Finally, respondent argues that this case should be dismissed for failure to exhaust administrative remedies; respondent asserts that petitioner has not filed any administrative remedy since 2013, and that his claims in this case are therefore unexhausted.

On June 23, 2022, petitioner filed a response.  [Doc. 32].  First, petitioner reiterates that the phone call to the Browns was a "public" communication. [Id.].  Second, he argues that President Trump's communication was clear and that he had issued an order to his staff to get Rosemond home for Christmas.  Petitioner argues that this is analogous to "[w]hen a supervisor tells his or her colleague to 'get me a cup of coffee,' or to 'get my mother flowers for her birthday,' or to 'get Bob in my office'" and that President Trump's statements were an order which was disobeyed in violation of the Constitution.  [Doc. 32

5

at 8]. Third, petitioner argues that no written warrant was required in this case. Fourth, that contrary to respondent's contention, granting habeas relief would not subject the clemency power to judicial control. Finally, petitioner contends that he had no duty to exhaust administrative remedies because exhaustion would be futile.

On July 22, 2022, respondent filed a reply. [Doc. 35]. Respondent argues that the President's statement "Let's get this guy home for Christmas," was neither public nor unambiguous. In particular, respondent argues that "Petitioner provides no factual basis or context for his allegation that 'President Trump told people in the room with him' to do something amounting to an 'order to his advisors.'" [Doc. 35 at 2]. Finally, respondent points out that petitioner has provided no explanation for the lack of a warrant of commutation in this case.

On August 10, 2022, petitioner filed a Motion to File Amended Declarations. Although petitioner is not seeking to file a surreply, petitioner wishes to file amended declarations from Jim and Monique Brown which contain additional details to clear up any ambiguity about additional staff or advisors in the room with President Trump at the time of the call. The amended declarations recount the phone conversation with additional details:

> 5.   On December 18, 2020, President Trump called me and informed me that he had decided to commute Mr. Rosemond's sentence to the time he had already served in prison.
>
> 6.   After a few minutes of introductory discussion, President Trump said: "I'm sitting here with counsel." President Trump told me that he had "looked at everything"–meaning the materials we had provided about Mr. Rosemond's case–and "believe you guys" that Mr. Rosemond's sentence should be commuted. President Trump said that "I want to do this" and "I'm gonna do it," referring to the commutation.
>
> 7.   President Trump then began speaking with other people in the room

6

with him.  I could hear several voices in the background in addition to the President's.

8. President Trump said: "How soon can we get this done? I want this expedited right away." I heard someone respond: "Right away." President Trump replied: "Good. I want this done. I want him home for Christmas.

9. President Trump then told the people in the room with him: "Let's get this guy home for Christmas."

[Doc. 36-1 ¶ 5–9].

## V. STANDARD OF REVIEW

### A.  Motion to Dismiss

A complaint must be dismissed if it does not allege "'enough facts to state a claim to relief that is plausible on its face.' **Bell Atl. Corp. v. Twombly**, 550 U.S. 554, 570 (2007) (emphasis added)." **Giarratano v. Johnson**, 521 F.3d 298, 302 (4th Cir. 2008). When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiffs, and must view the allegations in a light most favorable to the plaintiffs.  **Edwards v. City of Goldsboro**, 178 F.3d 231, 243–44 (4th Cir. 1999).

When rendering its decision, the Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice.  **Anheuser-Busch, Inc. v. Schmoke**, 63 F.3d 1305, 1312 (4th Cir. 1995).  In **Twombly**, the Supreme Court, noting that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

7

of action will not do," Id. at 555, upheld the dismissal of a complaint where the plaintiffs did not "nudge[ ] their claims across the line from conceivable to plausible." *Id*. at 570.

This Court is well aware that "[m]atters outside of the pleadings are generally not considered in ruling on a Rule 12 Motion." **Williams v. Branker**, 462 F. App'x 348, 352 (4th Cir. 2012). "Ordinarily, a court may not consider any documents that are outside of the Complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." **Witthohn v. Fed. Ins. Co.**, 164 F. App'x 395, 396 (4th Cir. 2006). However, the Court may rely on extrinsic evidence if the documents are central to a plaintiff's claim or are sufficiently referred to in the Complaint. *Id*. at 396–97.

## B. Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." **Anderson**, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." **Matsushita Elec.**

8

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

## VI.   ANALYSIS

**A. Exhaustion of Administrative Remedies is Inapplicable to Petitioner's Claim**

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a). "Federal prisoners must exhaust their administrative remedies prior to filing § 2241 petitions. Failure to exhaust may only be excused upon a showing of cause and prejudice." *McClung v. Shearin*, 90 F. App'x 444, 445 (4th Cir. 2004) (citing *Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 634-35 (2d Cir.2001), *Little v. Hopkins*, 638 F.2d 953, 953-54 (6th Cir.1981)). Exhaustion as provided in § 1997e(a) is mandatory, regardless of the relief offered through administrative procedures. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citing *Booth*, 532 U.S. at 741). "Those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter*, 534 U.S. at 524.

However, the exhaustion requirement is not applicable in this case. As Magistrate Judge Aloi previously summarized,

> The undersigned does not dispute that the PLRA mandates the exhaustion of administrative remedies, or that similar principles have been applied in habeas corpus actions. However, the requirements of the PLRA are applicable to civil suits in which a prisoner challenges the conditions of his confinement, not habeas proceedings challenging the execution of a sentence under 28 U.S.C. § 2241. *See LaRue v. Adams*, 2006 WL 1674487 *5 - *7 (S.D. W.Va. June 12, 2006) (citing *Smith v. Angelone*, 111 F.3d 1126, 1129 - 31 (4th Cir.) *cert. denied*, 521 U.S. 113 (1997)).

*Mubang v. Warden, Hazelton Secure Female Facility*, No. 1:18-CV-181, 2020 WL 1902552, at *8 (N.D. W.Va. Jan. 22, 2020) (Aloi, M.J.), *report and recommendation adopted*, No. 1:18-CV-181, 2020 WL 773440 (N.D. W.Va. Feb. 18, 2020). Indeed, the exhaustion requirement of the PLRA applies to actions "brought with respect to prison conditions." 42 U.S.C. § 1997e(a); *see also Hayes v. Warden, F.C.I. Gilmer*, No. 3:14-CV-91, 2015 WL 1542455, at *6 (N.D. W.Va. Apr. 2, 2015) (Seibert, M.J.) ("recognizing that the PLRA mandates the exhaustion of administrative remedies and similar principles have been applied in habeas corpus actions, the requirements of the PLRA are applicable to civil suits in which a prisoner challenges the conditions of his confinement, not habeas proceedings challenging the execution of a sentence under 28 U.S.C. § 2241.").

**B. Petitioner is not entitled to relief because the communication at question was not "public" and there is no indication that President Trump intended to commute Rosemond's sentence.**

The President has "Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 1. "[T]he pardon power includes the authority to commute sentences in whole or in part." *Dennis v. Terris*, 927 F.3d 955, 957–58 (6th Cir. 2019) (citing *Schick v. Reed*, 419 U.S. 256, 260 (1974)). As the Eleventh Circuit recently summarized,

> The Constitution places few restrictions on the Executive's pardon power. It empowers the President to pardon only "Offences against the United States" and constrains the President from exercising the power "in Cases of Impeachment." U.S. Const. art. II § 2, cl. 1. Otherwise, the President possesses a "broad power" to "'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions." ***Schick***, 419 U.S. at 266, 95 S.Ct. 379. So long as the President does not use the power to pardon to violate another provision of the Constitution, Congress and the Judiciary have no power to interfere with its exercise. *Id*. at 264, 266–67, 95 S.Ct. 379; *see also* ***Ohio Adult Parole Auth. v. Woodard***, 523 U.S. 272, 276, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) ("[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." (internal quotation marks omitted)).

***Andrews v. Warden***, 958 F.3d 1072, 1076–77 (11th Cir. 2020),

Early on, the Supreme Court seemed to indicate that in dicta that delivery in writing was an assumed part of an act of clemency: "A pardon is a deed to the validity of which delivery is essential; and delivery is not complete without acceptance; it may then be rejected by the person to whom it is tendered; and if it be rejected, we have discovered no power in a court to force it to him." ***United States v. Wilson***, 32 U.S. 150 (1833). However, the Court later rejected the idea that the prisoner's consent was necessary for a commutation:

> A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent determines what shall be done. So far as a pardon legitimately cuts down a penalty it affects the judgment imposing it. No one doubts that a reduction of the term of an imprisonment or the amount of a fine would limit the sentence effectively on the one side and on the other would leave the reduced term or fine valid and to be enforced, and that the convict's cansent (sic) is not required.

***Biddle v. Perovich***, 274 U.S. 480, 486–87 (1927).  As petitioner observes, there does not appear to be a decision on-point which establishes what, precisely, is needed for the President to enact an act of clemency.  [Doc. 1 at 11].  However, petitioner makes a reasonable summary: (1) the act of clemency must be communicated publicly; (2) the President must reasonably communicate the clemency decision; and (3) once completed, the act of clemency cannot be reversed.  [Id.].  Under these criteria, the undersigned finds that petitioner is unable to show that he is entitled to relief.

First, the undersigned agrees with respondent that the communication at issue in this case was not publicly communicated.  Petitioner argues that the form of an act of clemency does not matter so long as the President communicates it publicly.  According to the declarations of Jim and Monique Brown, the communication at issue was a phone call between the Browns and President Trump, along with unidentified people in the room with the President.  The undersigned agrees with respondent that this was not a public communication.  Indeed, it is hard to imagine a less public communication.

Petitioner urges this Court to apply a rule from ***United States v. Chase***, a case dealing with a statute restricting lewd publications from being sent in the mail, for the proposition that "the sending or mailing a letter by one person to another is a sufficient publication" to be considered "other publication."   135 U.S. 255, 260–261 (1890).  Petitioner argues that a communication is therefore public "if it is sent from 'one person to another.'" [Doc. 32 at 5]. Under this interpretation, *every* communication between two or more persons is "public."  Petitioner provides no explanation for why "publication" for purposes of defamation cases supplies the definition of "public communication" for purposes of an executive act of clemency, and the undersigned finds none.  Merriam-

12

Webster's legal dictionary lists definitions of "public" which include: "exposed to general view;" "known or recognized by many or most people;" and "accessible to or shared by all members of the community."  *Public*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/public#legalDictionary (last visited August 11, 2022).

Likewise, petitioner points to the Restatement (Second) of Torts § 577 for the proposition that "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed."  Restatement (Second) of Torts § 577 (1977).  The Restatement goes on to later differentiate "publication" for defamation purposes and "publicity," or to make something public:

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

Restatement (Second) of Torts § 652D (1977).  Under any common sense interpretation of "public communication," a phone call to two individuals, with staff present in the room, is not publicly communicated.

Second, and more importantly, the undersigned finds that the facts as alleged in the petition fail to show that the President intended to commute petitioner's sentence. Petitioner emphasizes that a clemency decision need not be in writing or delivered to any particular person.  Petitioner relies on a 1929 memorandum from the Office of the Solicitor General for the proposition that there is a distinction between the exercise of clemency

13

and the record of clemency.  Discussing pardon warrants, the acting solicitor general, Alfred A. Wheat, stated:

> Neither the Constitution nor any statute prescribes the method by which Executive clemency shall be exercised or evidenced.  It is wholly a matter for the President to decide, as a practical question of administrative policy.  Nobody but the President can exercise the power, but the power having been exercised the method of making a record and evidence thereof is a mere detail which he can prescribe in accordance with what he deems to be the practical necessities and proprieties of the situation.
> The important thing is to guard against the issue of spurious pardons.  That ought not to be difficult.  Then, too, custom and propriety require that the pardoned man be given some token to show that he has been pardoned.  That need not have the President's autograph.  If it shall bear the facsimile signature and be certified by an official having charge of the records as having been issued by the President, or by his direction, that will be sufficient.  **Indeed, I would say that a mere certificate signed by the custodian of the records that a pardon had been granted would suffice.**  The details can be worked out by those familiar with the practical necessities.  To burden the President with the labor of signing the warrants is, as a matter of law, wholly unnecessary.

[Doc. 1-5 at 4–5] (emphasis added).  In Wheat's view, the record of clemency, although distinct from the act of clemency, is necessary "to guard against the issue of spurious pardons."  While the method of making the record is "a mere detail" left to the President's discretion, there must be some record to serve as a token of the pardon.  The proprieties must be observed.

Similarly, petitioner relies heavily on the article "The Toussie Pardon, 'Unpardon,' and the Abdication of Responsibility in Clemency Cases" by Jeffrey Crouch.  The article discusses the case of Isaac Robert Toussie: on December 23, 2008, the Department of Justice issued a press release declaring that President George W. Bush had granted pardons to a number of individuals including Toussie.  Following media attention and public controversy, the administration reversed course the next day, with the White House press secretary announcing that the President had directed the Pardon Attorney not to

execute and deliver a Grant of Clemency to Toussie.  Petitioner points to Crouch's argument that

> the full, unconditional pardon granted to Toussie was complete from the moment it was signed, and therefore could not be stopped or interrupted before delivery: it was done as soon as Bush signed the master warrant containing Toussie's name.  The pardon attorney may have been responsible for delivering a *record* of the pardon to individual recipients, such as Toussie, but the record of the pardon was just that–it was not the actual pardon, but merely a memento of the master clemency warrant.

[Doc. 1-6 at 16].  Unlike the instant case, though, Toussie's case involved a master warrant signed by the president.  Even accepting Crouch's argument, the signed master warrant served as a document evincing the president's intent to pardon Toussie.  Indeed, as Crouch goes on to state: "the master warrant is the document that grants the pardon, not the individual record of pardon."  [Id. at 17].

Similarly, Crouch cites a hearing in front of the House Judiciary Subcommittee on the Constitution on February 28, 2001, in which Margaret Colgate Love, a former U.S. Pardon Attorney, stated "Once the pardon warrant is signed, *that is the public act that accomplishes the clemency action*. . . All that business about deeds and delivery, I think, has pretty much been overcome, after the *Biddle* case."  [Doc. 1-6 at 15] (emphasis added).

As respondent points out, President Trump followed an established procedure for acts of clemency.  For sentence commutations, he executed a warrant of commutation with a directive to the Bureau of Prisons to release the inmate.  This included commutation warrants issued on December 22 and 23, 2020, mere days after the phone call in this case.  The lack of a commutation warrant in this case shows a clear lack of intent on the part of President Trump to commute Rosemond's sentence.  Accordingly, petitioner is not

"in custody in violation of the Constitution or laws or treaties of the United States" and his petition should be dismissed.

## VII.     RECOMMENDATION

For the foregoing reasons, the undersigned recommends that Respondent's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [**Doc. 23**] be **GRANTED**, and that the petition [**Doc. 1**] be **DENIED** and **DISMISSED WITH PREJUDICE**.  As a final matter, the undersigned recommends that the pending Motion to file Amended Declarations [**Doc. 36**] be **GRANTED**.

Each party shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.  A copy of such objections should also be submitted to the United States District Judge.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a copy of this Report and Recommendation to counsel of record and to mail a copy to the *pro se* petitioner by

certified mail, return receipt requested. In addition, this Report and Recommendation completes the referral from the District Court. The Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

    **DATED:** August 16, 2022.

                                            */s/ James P. Mazzone*
                                            JAMES P. MAZZONE
                                            UNITED STATES MAGISTRATE JUDGE