**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-7188**

───────────

JAMES ROSEMOND,

        Petitioner – Appellant,

   v.

RICHARD HUDGINS, Warden, USP Hazelton,

        Respondent – Appellee.

───────────

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:21-cv-00175-JPB)

───────────

Argued:  December 8, 2023             Decided:  February 13, 2024

───────────

Before AGEE, THACKER, and RUSHING, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Thacker and Judge Rushing joined.

───────────

**ARGUED:**  Michael E. Rayfield, SHOOK, HARDY & BACON, New York, New York, for Appellant.  Michael Alan Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Mariham Yaft, SHOOK, HARDY & BACON, Denver, Colorado, for Appellant.  Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William J. Ihlenfeld, II, United States Attorney, Maximillian F. Nogay, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

AGEE, Circuit Judge:

James Rosemond filed a 28 U.S.C. § 2241 petition for a writ of habeas corpus, arguing that his continued detention is unconstitutional because then-President Donald J. Trump commuted his sentence to time served during a telephone conversation with two of Rosemond's supporters. The district court dismissed the § 2241 petition, and Rosemond appealed. For the reasons set out below, we affirm the district court's judgment.

I.

Rosemond's underlying offenses have little bearing on the issue before us. In brief, as a result of two separate federal prosecutions in the 2010s, Rosemond was convicted of numerous offenses arising from his role in drug trafficking and a murder. He is currently serving multiple life sentences in the custody of the Bureau of Prisons.

After exhausting other avenues of relief, Rosemond began pursuing a presidential commutation in 2015 and he continued to seek that relief once President Trump took office in January 2017. Several high-profile individuals supported Rosemond's petition for clemency, including former Cleveland Browns running back Jim Brown and his wife, Monique Brown.[1] For many years, Rosemond's attorneys and supporters worked with the Department of Justice's Office of the Pardon Attorney ("the Pardon Office") and the White

---

[1] The Court notes that Jim Brown died in May 2023, while this case was on appeal. Any practical impact this may have had on Rosemond's claim is negligible and is lessened by the fact that Jim and Monique Brown signed substantively identical declarations based on their joint participation in the telephone call at the heart of Rosemond's § 2241 petition. Thus, Mr. Brown's death does not factor into our analysis.

2

House regarding his petition. In addition, the Browns spoke personally with President Trump and his advisors regarding Rosemond's petition. One of those conversations forms the basis for Rosemond's petition.

The Browns signed declarations under penalty of perjury, *see* 28 U.S.C. § 1746, stating that on December 18, 2020, they participated in a telephone call with President Trump. Based on that telephone call, the Browns have stated their "belie[f] that Mr. Rosemond's sentence was commuted," J.A. 24, 27, because President Trump "had decided to commute Mr. Rosemond's sentence to the time he had already served in prison," J.A. 23, 26. The Browns quote President Trump as explaining during their telephone call that he was "sitting here with counsel," he had "looked at everything" related to Rosemond's petition, and he "believe[d] you guys." J.A. 23, 26. The Browns represent that President Trump then said, "'I want to do this' and 'I'm gonna do it,' referring to the commutation." J.A. 23, 26. They claim that they next heard President Trump speaking to individuals in the room as he asked, "How soon can we get this done? I want this expedited right away," to which an unknown person responded, "Right away." J.A. 24, 26. And the Browns represent that they heard Trump reply, "Good. I want this done. I want him home for Christmas," telling the people in the room with him, "Let's get this guy home for Christmas."[2] J.A. 24, 26.

From the time of the telephone call with the Browns to the end of President Trump's term of office on January 20, 2021, President Trump executed written clemency warrants

---

[2] The Browns' declarations both purport to quote President Trump. No recording or transcript of the telephone call is in the record.

relating to 193 individuals.[3] Those warrants—as well as other clemency decisions rendered during his presidency—are publicly accessible on the Pardon Office's website, which provides .pdf copies and descriptions of all presidential pardons and commutations. *See Pardons Granted by President Donald J. Trump (2017-2021)*, https://www.justice.gov/pardon/pardons-granted-president-donald-j-trump-2017-2021 [https://perma.cc/438D-NKM2] (last visited Feb. 9, 2024); *Commutations granted by President Donald J. Trump (2017 - 2021)*, https://www.justice.gov/pardon/commutations-granted-president-donald-j-trump-2017-2021 [https://perma.cc/78L2-CEA3] (last visited Feb. 9, 2024). Nearly all of these decisions were also announced in White House Press Releases. *See Statement from the Press Secretary Regarding Executive Grants of Clemency*, Jan. 20, 2021, https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-executive-grants-clemency-012021/ [https://perma.cc/8FKA-HWTW] (last visited Feb. 9, 2024) (announcing 143 grants of clemency); *Statement from the Press Secretary Regarding Executive Grants of Clemency*, Dec. 23, 2020, https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-executive-grants-clemency-122320/ [https://perma.cc/LNH5-PWBQ] (last visited Feb. 9, 2024) (announcing 29 grants of clemency); *Statement from the Press Secretary Regarding Executive Grants of Clemency*, Dec. 22, 2020

---

[3] As discussed in greater detail later in the opinion, under the modern, *voluntary* practice of routing clemency petitions through the Pardon Office, a successful petition culminates in the President signing a "warrant." *See* 28 C.F.R. § 1.7 (discussing "[n]otification of grant of clemency" through a "warrant of pardon" or "warrant of a commutation"). This opinion adopts the term "clemency warrant" to encompass both types of warrants generally issued when the President exercises his clemency power.

https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-executive-grants-clemency-122220/ [https://perma.cc/2FRJ-BET3] (last visited Feb. 9, 2024) (announcing 20 grants of clemency).

No warrant of commutation relating to Rosemond has been submitted in the record in this case, nor does Rosemond contend that one exists. In addition, the Trump White House's archived press releases and the Pardon Office's records do not reflect any clemency action pertaining to Rosemond. Instead, Rosemond's petition is listed as "Pending." *See* https://www.justice.gov/pardon/search-clemency-case-status [https://perma.cc/VVN6-UR2X] (last visited Feb. 9, 2024) (search "James Rosemond" in "Find by Name").

It is not clear from the record whether the Browns or any other individual assisting Rosemond with his petition contacted the Pardon Office or the White House about it following the December 18 telephone call while President Trump still held office. After the inauguration of President Joseph R. Biden on January 20, 2021, Rosemond—through surrogates—unsuccessfully "attempted to persuade the Biden Administration to act on his commutation." J.A. 10.

In October 2021, Rosemond filed his § 2241 petition in the United States District Court for the Northern District of West Virginia.[4] In it, he claimed that President Trump commuted his sentence to time served during the December 18 telephone call with the

---

[4] This district court had jurisdiction over Rosemond's § 2241 petition because he was serving his sentence at USP Hazelton at the time it was filed. 28 U.S.C. § 2241(d).

In December 2021, Rosemond amended his § 2241 petition to reflect that a new warden had been named to USP Hazelton; the substance of the petition did not change.

Browns and that nothing more was needed to effectuate that executive act of clemency. He asked that the district court grant his § 2241 petition and direct the Warden of USP Hazelton to release him. Rosemond attached the above-referenced § 1746 declarations signed by the Browns to his § 2241 petition.

The Warden moved to dismiss or, in the alternative, for summary judgment. In relevant part, he relied on three grounds to support the motion: (1) the telephone call with the Browns did not satisfy the requirement that a clemency decision be made "public"; (2) whatever the Browns' personal characterization of the December 18 telephone call, President Trump's alleged statements during that call did not demonstrate a present-tense statement actually commuting Rosemond's sentence to time served; and (3) the absence of a signed commutation warrant showed President Trump did not intend to commute Rosemond's sentence given that he followed that established method of invoking his clemency power, without fail, throughout his presidency, including in the weeks immediately after the December 18 telephone call.

The magistrate judge prepared a report and recommendation (R&R) to grant the Warden's motion. In doing so, the magistrate judge relied on two independent, alternative grounds: (1) that the telephone conversation at issue did not satisfy the requirement that a clemency decision be "public," and (2) that the record contained insufficient evidence that President Trump intended to commute Rosemond's sentence to time served given the admitted lack of a signed commutation warrant. [J.A. 102–18.]

After considering Rosemond's objections to the R&R, the district court adopted the R&R, granted the Warden's motion, and dismissed Rosemond's § 2241 petition with

prejudice. *Rosemond v. Hudgins*, No. 5:21-CV-175, 2022 WL 4474265 (N.D.W. Va. Sept. 26, 2022).  In so doing, the district court did not address the R&R's first rationale, the component of whether the clemency decision was "public." Instead, pointing to the historical practice of many presidents, including President Trump, the court concluded that "a grant of clemency need[s] to be documented by a writing." *Id.* at *3. It then noted that the only writings in support of Rosemond's claim that his sentence had been commuted were the Browns' declarations. But the district court deemed the declarations to contain inadmissible hearsay, not subject to any exception. It thus declined to consider their contents concerning President Trump's alleged statements during the December 18 telephone call. And without being able to rely on the narrative contained in the Browns' declarations, the district court concluded Rosemond lacked support for his claim that President Trump had commuted his sentence. For this reason, the district court granted the Warden's motion and dismissed Rosemond's § 2241 petition.

Rosemond noted a timely appeal, and we have jurisdiction under 28 U.S.C. § 1291.

II.

The Court reviews de novo the district court's denial of § 2241 habeas corpus relief. *Seay v. Cannon*, 927 F.3d 776, 780 (4th Cir. 2019). To be entitled to this relief, a federal prisoner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

Before turning to our substantive analysis, we note a procedural peculiarity in this case. On appeal, Rosemond treats the district court's order as having granted a Rule

12(b)(6) motion to dismiss. However, some ambiguity exists because the district court's opinion refers repeatedly to the Warden's motion by its full caption, which was styled as a "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment." *Compare Rosemond v. Hudgins*, No. 5:21-cv-00175-JPB, ECF No. 23 (N.D.W. Va. Apr. 4, 2022), *with Rosemond*, 2022 WL 4474265, at *1, *6. That's true even in the order's disposition, which "grants [the Warden's] Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment." *Rosemond*, 2022 WL 4474265, at *6. The opinion's adoption of the R&R adds no clarity because the magistrate judge in one place recommended that the Warden's "Motion to Dismiss be granted," J.A. 103, but then in another place recommended granting the Warden's "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," J.A. 117.

The district court's analysis leans somewhat more toward a summary-judgment disposition, though not indisputably so. Although it recites the Rule 12(b)(6) and the summary judgment standards at the outset, the court's substantive analysis never expressly takes into account the proper lens for viewing the complaint's allegations or the declarations based on each type of motion. What's more, the opinion's hearsay discussion undertakes a summary-judgment-style analysis and its disposition concludes that "there are no facts in dispute," *Rosemond*, 2022 WL 4474265, at *6, a phrase that usually sounds in summary judgment even if it does not match the precise standard.

In other cases the district court's approach would require further parsing. Here, however, four reasons lead us to conclude that, consistent with Rosemond's assertion, we can simply construe the district court's order as having granted a Rule 12(b)(6) motion.

8

First, our overarching review of whether Rosemond has satisfied the standard for obtaining § 2241 relief is de novo, as is our review of the legal principles applying to the exercise of the President's clemency power. That fundamental inquiry does not change at either procedural posture and we can affirm the denial of § 2241 relief on any ground apparent from the record, even if the district court's path was erroneous. *Cf. United States v. Dinkins*, 928 F.3d 349, 353 n.3 (4th Cir. 2019) (affirming the denial of § 2255 relief on different grounds than the district court's order relied on).

Second, the district court could have considered the contents of the Browns' declarations in considering a Rule 12(b)(6) motion to dismiss because those documents were attached to Rosemond's § 2241 petition and their relevant substance was largely set out in the petition itself as allegations that would have to be taken as true at that stage of the proceeding. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) ("Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the documents attached or incorporated into the complaint." (cleaned up)). So, this isn't a case where a decision to rely on those documents would have prejudicially affected Rosemond. To the contrary, Rosemond wanted them considered as the basis for his argument and it would have been appropriate for the district court to do so in ruling on a motion to dismiss.

Third, considering the declarations' contents or limiting the analysis to a Rule 12(b)(6) motion does not prejudice the Warden. After all, he filed the motion seeking alternative relief, and he did not rely on any evidence outside the § 2241 petition's

allegations and the Browns' declarations when arguing in favor of both types of motions. Thus, this isn't a case that required review using the summary judgment standard to consider additional materials. *See, e.g.*, *Ross v. Meese*, 818 F.2d 1132, 1133 & n.2 (4th Cir. 1987) (declining to resolve the ambiguity as to whether the district court granted Rule 12(b)(6) dismissal or summary judgment because the court's analysis looked only to uncontested facts beyond the complaint's allegations). What's more, the Warden—after being on notice of Rosemond's characterization of the order as denying Rule 12(b)(6) relief in the opening brief—did not take issue with that view in his response brief.

Fourth, we can resolve this appeal by considering the Browns' declarations but without determining the admissibility, in part or in whole, of their contents. Indeed, we expressly do *not* decide whether the district court erred in concluding that the Browns' declarations contained inadmissible hearsay. Instead, we assume, without deciding, that the district court erred in holding that they were inadmissible. We also assume, without deciding, that the declarations' statements should be viewed as true given that they formed part of the petition's allegations. These assumptions lead to the same conclusion— affirmance of the district court's denial of § 2241 relief. They just do so on somewhat different grounds than those identified by the district court.

We therefore assume that Rosemond is correct that the district court granted the Warden's Rule 12(b)(6) motion to dismiss and consider whether the § 2241 petition plausibly alleged that he was being held in violation of the Constitution. Our approach removes any need to resolve the ambiguities in the district court's opinion and it is appropriate in the interest of judicial economy. *See Wohl v. Keene*, 476 F.2d 171, 176 n.5

(4th Cir. 1973) (declining to resolve the "procedural ambiguity" of whether the district court decided a "pure motion to dismiss" or a motion for summary judgment because it was not necessary to do so under the circumstances presented).

### III.

### A.

The U.S. Constitution bestows solely on the President the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 2. This clemency power means that the President can both pardon an underlying conviction or commute any part of a sentence. *Schick v. Reed*, 419 U.S. 256, 266 (1974) (recognizing the President's "broad power" to encompass the ability to "'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions"); *see Andrews v. Warden*, 958 F.3d 1072, 1076 (11th Cir. 2020) ("Because the greater power ordinarily includes the lesser power, the President's pardon power includes the authority to commute a sentence to a lesser punishment."). The President's authority to grant clemency is "unlimited," save for the limits imposed by the Constitution, "extend[ing] to every offence known to the law, and may be exercised at any time after its commission, either before legal proceedings are taken, or during their pendency, or after conviction and judgment." *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866); *see also United States v. Klein*, 80 U.S. (13 Wall.) 128,

11

147 (1871) ("To the executive alone is [e]ntrusted the power of pardon; and it is granted without limit.").[5]

The President's clemency power is not only expansive, but also exclusive. Neither the legislative nor the judicial branches can exercise or alter it. *Schick*, 419 U.S. at 266 (reiterating that the clemency power "cannot be modified, abridged, or diminished by the Congress"); *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276 (1998) ("[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." (cleaned up)); *Andrews*, 958 F.3d at 1076 ("So long as the President does not use the power to pardon to violate another provision of the Constitution, Congress and the Judiciary have no power to interfere with its exercise."). That separation of powers was intentional, as the clemency power "operates as a check on the other two branches." *Andrews*, 958 F.3d at 1076; *see Ex parte Grossman*, 267 U.S. 87, 120–21 (1925) ("Executive clemency exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. . . . It is a check entrusted to the executive for special cases.").

---

[5] The clemency power extends beyond pardons and commutations, and has been invoked to grant amnesty and reprieves; these acts of grace can be bestowed with or without conditions, at the President's prerogative. *See Klein*, 80 U.S. at 147 ("Pardon includes amnesty. It blots out the offence pardoned and removes all its penal consequences. It may be granted on conditions."). For our purposes, it is sufficient to note that a "pardon" would generally negate the effects of the underlying conviction, while a "commutation" leaves the conviction in place and lessens the sentence in some way. *See Schick*, 419 U.S. at 266 (discussing the President's pardon power as the "plenary authority . . . to 'forgive' the convicted person in part or entirely," and the commutation power as the authority "to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable").

B.

From this broader historical background, two principles emerge as central to our review of the district court's denial of Rosemond's § 2241 petition. First, absent a constitutional constraint, the President's ability to commute a sentence is not subject to any further formal limits or requirements. Second, the Judiciary's role in the matter of executive commutations is very sharply circumscribed.

1.

The first principle resolves the matter of whether a writing is required as part of the President's exercise of the clemency power. The answer is undoubtedly no. The plain language of the Constitution imposes no such limit, broadly providing that the President "shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 2. The constitutional text is thus silent as to any particular form the President's clemency act must take to be effective. *See Dennis v. Terris*, 927 F.3d 955, 958 (6th Cir. 2019) (observing that even the constitutional "limits on the President's pardon power . . . are little defined").

The records from the Constitutional Convention of 1787 are similarly sparse, but fully support the conclusion that the Constitution, drawing on the long history of the clemency power in England, meant to bestow the full range of that authority on the President. In short, the limited discussions focused on the scope of the President's power, but did not describe its method of execution. Jeffrey Crouch, *The Presidential Pardon Power* 15–19 (2009) (discussing drafts and debates at the Constitutional Convention).

13

According to James Madison's notes from the Constitutional Convention, the clause relating to the President's pardon power was debated only briefly by the full assembly, with consideration of a proposed amendment to include an exception for cases of treason (motion failed). *Journal of the Federal Convention Kept by James Madison* 612–13, 734–35 (E.H. Scott ed. 2003); *see also Ex parte Grossman*, 267 U.S. at 112–13 (discussing the Framers' approach). As the Supreme Court has recognized, although the Founding Fathers provided little guidance in their debates regarding the President's clemency power, they necessarily drew on their familiarity with its "centuries old" development in England:

> Although the authors of this clause surely did not act thoughtlessly, neither did they devote extended debate to its meaning. This can be explained in large part by the fact that the draftsmen were well acquainted with the English Crown authority to alter and reduce punishments as it existed in 1787.

*Schick*, 419 U.S. at 260; *United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160–61 (1833) (Marshall, C.J.) ("[W]e adopt [England's] principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it."); *see also* 5 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 395–96 (1803) ("[T]he last and surest resort is in the king's most gracious *pardon*; the granting of which is the most amiable prerogative of the crown. . . . [I]t is that act of his government, which is the most personal, and most entirely his own. . . . [N]o other person hath power to

pardon or remit any treason or felonies whatsoever; but that the king hath the whole and sole power thereof, united and knit to the imperial crown of this realm.").[6]

No party here has provided any evidence that the English monarch was confined to exercising his clemency authority in 1787 by means of a written instrument, nor have we found any. Accordingly, no known historical basis exists for restricting the Constitution's grant of that authority to require a writing.

Based on this limited but textual and historical foundation, we readily determine that nothing in the Constitution restricts the President's exercise of the clemency power to commutations that have been rendered through a documented writing. The district court thus erred by concluding otherwise. To be sure, as a practical matter, a writing—such as the clemency warrants President Trump signed for all other pardons and commutations granted throughout his presidency—will generally be the means of proving to a third party that the act has occurred. Certainly, history has borne out that a written document of some sort is the traditional method of communicating the presidential pardon to others. *See generally* Margaret Colgate Love, *Of Pardons, Politics and Collar Buttons: Reflections on the President's Duty to be Merciful*, 27 Fordham Urb. L.J. 1483, 1488 n.23, 1489 n.25, 1490 n.29, 1491 n.32 (2000) (describing the evolving processes by which Presidents typically exercised—and created records of—their constitutional pardon power). But such a clemency warrant or, indeed, any writing, is not *required* for the President to exercise

---

[6] Alexander Hamilton expressed a similar understanding in The Federalist No. 69, reflecting that the presidential pardon power "resembl[ed] equally that of the King of Great-Britain and the Governor of New-York." *Schick*, 419 U.S. at 263 (quoting The Federalist No. 69, at 464 (Alexander Hamilton) (J. Cooke ed. 1961)).

this authority under the Constitution. Hypothetically, the President could proclaim at a press conference in the Rose Garden that he has pardoned a particular individual, and that would be a valid act under Article II, § 2, Clause 2 of the Constitution, even absent a writing. We illustrate this point drawing from real events. In 1974, President Gerald R. Ford spoke in front of members of the White House press corps to make a videorecording that was later broadcast throughout the United States: "I . . . have granted . . . a full, free, and absolute pardon unto Richard Nixon for all offenses against the United States which he . . . has committed or may have committed or taken part in" during a specified period of time. Crouch, *supra*, at 1. Although in fact President Ford immediately followed his remarks by signing a written pardon, there can be little doubt under the above principles that had he failed to do so, President Ford's public words nonetheless would have carried the full weight of the presidential clemency authority as of the moment they were conveyed. And because the clemency power can be exercised without a writing, it necessarily follows that such a writing is not the sole means by which a petitioner could *prove* the President's exercise of that power.

A 1929 memorandum from the Office of the Solicitor General, which the Warden and the district court both cite to support their contrary position, fully supports our understanding.[7] There, Acting Solicitor General Alfred A. Wheat was concerned with the

---

[7] While we discuss the memorandum, we note the obvious fact that the view expressed by the Office of the Solicitor General in 1929 concerning the President's exercise of the clemency power is just that—a view. Even if the memorandum supported the Warden's view that a writing was necessary, it does not and could not bind us in understanding the nature of the constitutional clemency power.

separate question of whether *records* of clemency must take a particular form, including whether it must be signed by the President personally. He opined that no constraints existed, pointing to the lack of any constitutional requirements on point and then turning to the practical goals of "guard[ing] against the issue of spurious pardons." J.A. 50. In reaching this conclusion, he drew on the principles we've already described regarding the near-unbridled scope of the President's clemency power, and he reiterated the distinction we have recognized between the act of clemency itself and any later record of that act:

> Neither the Constitution nor any statute prescribes the method by which Executive clemency shall be exercised or evidenced. It is wholly a matter for the President to decide, as a practical question of administrative policy. Nobody but the President can exercise the power, *but the power having been exercised* the method of making a record and evidence thereof is a mere detail which he can prescribe in accordance with what he deems to be the practical necessities and proprieties of the situation.

J.A. 50 (emphasis added).

Similarly, although modern Presidents have voluntarily channeled the exercise of their clemency power through the Pardon Office, that too does not create any constitutional limits on the ability of the President to exercise that power or whether to use the Pardon Office at all. As the relevant federal regulations acknowledge from the outset, they "are advisory only and for the internal guidance of Department of Justice personnel. They create no enforceable rights in persons applying for executive clemency, *nor do they restrict the authority granted to the President under Article II, section 2 of the Constitution.*" 28 C.F.R. § 1.11 (emphasis added). So, the regulations' provisions for a "[n]otification of grant of clemency," *id.* § 1.7, through the issuance of a pardon or commutation warrant are ways the Executive has voluntarily chosen to administratively process and announce the exercise

17

of the clemency power rather than being any constitutionally mandated means for doing so.

Thus, although the historical and more recent practice may allow one reasonably to expect a writing to accompany or follow the exercise of the presidential clemency authority, the absence of a writing does not equate to proof that a commutation did not occur. Applied here, the district court erred in concluding that a writing is a necessary requirement to the exercise of the Executive's constitutional clemency power. Put another way, Rosemond's inability to come forward with a commutation warrant or equivalent writing from President Trump does not dictate the outcome of his § 2241 petition.

## 2.

The problem for Rosemond, then, is not just the lack of a clemency warrant per se; it is his failure to allege the existence of evidence that President Trump in fact commuted his sentence. His argument rests entirely on the assertions set forth in the Browns' declarations, but those declarations do not prove what he claims they do.

At the outset, the portions of the Browns' declarations asserting that President Trump allegedly commuted Rosemond's sentence are only the Browns' characterizations of and "belief[s]" about the substance of the December 18 telephone call. J.A. 23–24, 26–27. But the Browns do not possess the clemency power, nor are they authorized to speak on President Trump's behalf. Therefore, it is President Trump's words—not the Browns' takeaways from them—that would be the sole basis for determining that Rosemond's sentence had been commuted.

Even assuming the factual accuracy and eventual admissibility of the information recited in the Browns' declarations regarding President Trump's purported statements, none of those statements during the December 18 telephone call reflect a declaratory statement that President Trump had previously or was *in that moment* commuting Rosemond's sentence. Instead, his statements are forward-looking, anticipating what he wanted to have happen at some point in the future. Specifically, he is alleged to have said, "I *want to* do this"; "I'm *gonna* do it"; "*How soon* can we *get this done*? I *want* this expedited right away"; "I *want this* done." J.A. 23–24, 26 (emphases added). The words "want" and "going to" express a desire about the future rather than declaring a *fait accompli*. *See Want*, Merriam-Webster, https://www.merriam-webster.com/dictionary/want [https://perma.cc/UF4N-9HZE] (last visited Feb. 9, 2024) (verb: "to have a strong desire for"; "to have an inclination to"; "to wish or demand the presence of"); *Want*, Oxford English Dictionary, https://www.oed.com/dictionary/want_v?tab=meaning_and_use#15314519 [https://perma.cc/TA55-KJVD] (last visited Feb. 9, 2024) (verb: "To desire, wish for"; "To wish or desire *to* do something"); *Be Going To*, Merriam-Webster, https://www.merriam-webster.com/dictionary/be%20going%20to [https://perma.cc/ZCD8-46WK] (last visited Feb. 9, 2024) (idiom: "used to talk about what will happen or could happen"); *Gonna*, Oxford English Dictionary, https://www.oed.com/dictionary/gonna_v?tab=meaning_and_use#2850779 [https://perma.cc/FFZ8-QXVE] (last visited Feb. 9, 2024) (colloquial verb: "Used to express a plan or intention, or to make a prediction"; "Am (or is, etc.) going to"). Similarly,

19

President Trump's inquiry and directive about timing ("How soon can we get this done? I want this expedited . . . .") does not reflect that he had already invoked his commutation authority or was doing so in that moment, but rather reflects his desire to act in the future. *Cf.* Crouch, *supra*, at 1 ("I, Gerald R. Ford, President of the United States, . . . *have granted* . . . a full, free, and absolute pardon unto Richard Nixon . . . . (emphasis added)).[8] The forward-looking, aspirational language President Trump allegedly used on December 18 is fatal to Rosemond's assertion that the Browns' declarations attest to a completed act of presidential commutation.

3.

While the Browns' declarations do not attest to an act of commutation, we also note an additional marker that supports this understanding of President Trump's alleged statements. But we are mindful that this marker is supportive only and not dispositive.

Specifically, the modern commutation practice—and both Rosemond's own use of that process and President Trump's reliance on it throughout his Presidency—further supports the denial of relief here. Rosemond's petition followed the process set out in the regulations, a process that those regulations say would have ended successfully with the issuance of a commutation warrant. During the course of his term—and for every other

---

[8] The caselaw on this point is scant, but we observe that at least one other circuit court of appeals has denied § 2241 relief in similar circumstances, agreeing that a distinction exists between a President's words expressing an *intent* to exercise the clemency authority and the words necessary to *invoke* that authority. *Griggs v. Fleming*, 88 F. App'x 705, 705 (5th Cir. 2004) (per curiam) (affirming dismissal of a § 2241 petition in which the federal inmate claimed relief was warranted because "President Clinton allegedly wrote a note evidencing an intent to pardon him," but no pardon was ever "actually received").

clemency he is alleged to have granted—President Trump issued signed warrants reflecting the exercise of his clemency power. That includes hundreds of warrants signed in the final days of his presidency, around the time of the December 18 telephone call. Rosemond acknowledges that he is alleging an irregular basis on which to assert that his sentence was in fact commuted, and, certainly, irregularity alone is not determinative (nor—as we have already noted—is the absence of a warrant). Instead, we simply note this established administrative process solely as confirmatory context supporting the conclusion that the plain meaning of President Trump's alleged words does not reflect an actual exercise of the commutation power.

In sum, although President Trump may have intended to exercise his clemency power to commute Rosemond's sentence at some future point in time, the words he is alleged to have used during the telephone call with the Browns did not do so. Nor is there any other evidence alleged to show that President Trump did so at some point after December 18 and while he still held the constitutional powers of the President. In fact, Rosemond's petition was proceeding along the process typically used to channel such requests, and that channel—when successful—would have typically ended with the President signing a commutation warrant. Instead, Rosemond's petition is still designated as pending on the Pardon Office website tracking all petitions submitted to it.

## C.

This brings us back to the second principle highlighted earlier regarding the clemency power—it is the President's prerogative to exercise it, not the Judiciary's. Recognizing that "[t]he pardoning power is one which the Constitution expressly vests in

the President," other courts of appeals have concluded that it must "be free of judicial control." *Yelvington v. Presidential Pardon & Parole Att'ys*, 211 F.2d 642, 644 (D.C. Cir. 1954) (declining to exercise "judicial control" over the clemency process by compelling "the President's assistants in this field . . . to submit to him documents [o]n behalf of a particular suitor for clemency" because it was for the President—not the courts—to "correct them" "[i]f they have erred" in so acting); *see Evans v. Muncy*, 916 F.2d 163, 167 (4th Cir. 1990) (warning against using the writ of habeas corpus to pursue executive clemency, noting that "[w]hile [a] petitioner has every right in our system to seek clemency, this [i.e., the Judiciary] is not the proper forum for that appeal").

We have no authority to fill the gap between President Trump's alleged desire to commute Rosemond's sentence on December 18 and his apparent failure to follow through with that intent in the final month of his presidency. The record contains no grounds for ascertaining why a commutation warrant was not delivered to the Warden, but none was. Rosemond's petition may have slipped through the cracks or something may have changed the President's mind after the telephone call. The reasons are beyond the scope of our review and ultimately irrelevant to whether we can grant relief. We cannot. Regardless of what occurred, and even considering the Browns' declarations, Rosemond's allegations concerning what President Trump said during the December 18 telephone call would not be sufficient to establish that President Trump in fact commuted Rosemond's sentence.

This separation-of-powers principle highlights another reason why President Trump's alleged statements during the December 18 telephone call do not constitute an act of executive clemency. Commutations can take many forms and the President is free to—

and often does—impose certain conditions to them. *See, e.g.*, *Commutations Granted by President Barack H. Obama (2009-2017)*, https://www.justice.gov/pardon/commutations-granted-president-barack-h-obama-2009-2017#CJAN192017     [https://perma.cc/DKK3-PC6C] (last visited Feb. 9, 2024) (conditioning several grants of commuted custodial sentences on "enrollment in residential drug treatment"). In addition, the decision to commute a sentence to "time served" addresses only the custodial sentence and the President may decide to commute or leave intact other parts of a defendant's sentence such as restitution and terms of supervised release. *Compare* Executive Grant of Clemency for Alice        Marie         Johnson          (June         6,         2018), https://www.justice.gov/pardon/page/file/1068926/dl?inline     [https://perma.cc/PY5G-3798] (last visited Feb. 9, 2024) (President Trump commuting a lifetime term of imprisonment to "time served" and "leav[ing] intact and in effect the five-year term of supervised release with all its conditions and all other components of the sentence"), *with* Executive Grant of Clemency for Roger Jason Stone, Jr. (July 10, 2020), https://www.justice.gov/pardon/page/file/1293796/dl?inline     [https://perma.cc/62RT-HYJZ] (last visited Feb. 9, 2024) (President Trump commuting an entire prison sentence and entire term of supervised release "with all its conditions," and "remit[ting] any unpaid remainder of the $20,000 fine imposed"). It is not clear what type of commutation President Trump intended from the words he purportedly uttered. Rosemond asserts that the President's silence on this point indicates that he was imposing no conditions, but his reliance on this inference merely heightens the disconnect between proof of a completed invocation of executive clemency and an invitation to step into the role of the executive.

For us to grant § 2241 relief on the basis of the Browns' declarations alone would be to unlawfully appropriate the executive clemency power to the Judiciary. The Constitution forbids us from doing so.

## IV.

For the reasons set forth above, the judgment of the district court denying Rosemond's § 2241 petition is

*AFFIRMED*.